Filed 5/25/22

SEE TWO SEPARATE CONCURRING OPINIONS

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANGEL ISAAC RAMIREZ,<br><br>    Defendant and Appellant. | H047847<br>(Monterey County<br>Super. Ct. Nos. 17CR001723 &<br>17CR006465) |

In superior court case No. 17CR001723, defendant Angel Isaac Ramirez was convicted of first degree murder (Pen. Code, § 187, subd. (a)),[1] and the jury found true allegations that he committed the offense in association with a criminal street gang (§ 186.22, subd. (b)(1)) and personally used a firearm (§ 12022.53). In superior court case No. 17CR006465, defendant pleaded no contest to assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) and admitted that he committed the offense in association with a criminal street gang (§ 186.22, subd. (b)(1)).

On appeal, defendant argues that his trial counsel was prejudicially deficient in failing to object to hearsay evidence that bolstered a witness's credibility and in failing to object and request a curative instruction when the prosecutor shifted the burden of proof during closing argument. We find no reversible error on these points.

---

[1] All further statutory references are to the Penal Code.

While this appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.), effective January 1, 2022. Assembly Bill No. 333, in part, amended section 186.22 to modify the showing necessary to sustain a gang enhancement. It also added section 1109, which, upon a defendant's request, requires the bifurcation of the trial of gang enhancement allegations from the trial of the offenses.

Defendant argues that amended section 186.22 applies retroactively, and that under the new requirements of that section, the gang enhancement findings in both cases must be reversed. He also argues that section 1109's bifurcation provision applies retroactively, and because his proceedings were not bifurcated, he is entitled to a new trial on the first degree murder charge. The Attorney General agrees that amended section 186.22 applies to this case, and that reversal of the gang enhancements is required. However, the Attorney General maintains that defendant forfeited his bifurcation claim, that, in any case, section 1109 applies prospectively only, and that any error was harmless.

We agree with the parties that the section 186.22 gang enhancements must be vacated and may be retried. But as to the bifurcation claim, we determine that amended section 1109 does not apply retroactively, and thus defendant's murder conviction remains valid. We reverse the judgment and remand for further proceedings concerning the gang enhancements.

I.   **BACKGROUND**

A.   *Jury Trial: Case No. 17CR001723*

1.   *Prosecution's Case*

On January 10, 2015, Dexter Barnett was with his children. They had gone to get haircuts and then walked to the corner store to get snacks. While in the store, Barnett and defendant got into an argument. Barnett's son remembered that it started when Barnett said something like, " 'What are you looking at[?]' " Defendant did not initially respond, "[h]e just kept smiling at [Barnett]." Barnett said, " 'Are you just going to keep

smiling . . . .' " Defendant responded, " 'Look. I'm just here to buy a beer . . . I don't want any problems.' " Defendant paid and left the store. Barnett and his sons paid and left too.

Barnett and defendant continued to argue outside the store. Defendant asked Barnett where he was from. Barnett said he was from Seaside. Defendant responded, " 'This is Salinas, not Seaside.' " Barnett's cousins then broke up the altercation and took Barnett and his children over to the barbershop. Barnett reported to the barbershop owner that "the Mexicans over there are tripping and they are banging on me." Barnett remained at the barbershop while his children went home.

Hanna S. was near the market at an apartment when she saw defendant. He was "intoxicated" and "cussing," and he "threw either some cans of beer or a box or some object at [Hanna's] feet," which "exploded," spraying her feet with beer. Hanna told a police investigator that "after that, he reached in his waistband. He pulled out a gun and was waving it around."

At 10:02 p.m., two hours after the first encounter between Barnett and defendant, surveillance video showed defendant near the barbershop. Barnett was still at the barbershop, standing outside near a vehicle. At 10:03 p.m., another surveillance video showed Barnett walk toward the trunk of a car and then toward the street corner. A person in dark clothing was standing there. The video then showed "movement" and "muzzle flashes from a gun being fired," causing Barnett to collapse dead on the sidewalk.

Defendant worked at Taylor Farms, which was approximately three miles from the location of the shooting. The drive time between the two locations was between 5 and 10 minutes. Interviewed a week after the murder, defendant stated that he went to work at 10:00 p.m. that day, and that he went in at the same time every day. However, a timecard reflected that defendant arrived at work at 10:52 p.m. that night. Later, defendant said he "got mixed up" because on some days he "went in at 10:00 [p.m.]" and on other days he

3

"went in at 11:00 [p.m.]." Defendant acknowledged that he had an argument with Barnett on the day of Barnett's killing, but said he decided to leave after noting Barnett's son was with him. Defendant maintained he never went back to the corner market. After being confronted with the surveillance video of him shortly before the shooting, defendant acknowledged that the video showed him near the corner market at 10:02 p.m. He maintained, however, that he did not shoot Barnett.

The firearm used to kill Barnett was recovered about a year later in the possession of two Norteño gang members. While in prison awaiting trial, defendant disclosed to another gang member that he was in custody for killing a black man.[2]

Derek Gibson was a "gang intelligence detective" and testified as an expert in the investigation of gang-related crimes within Monterey County, specifically the Norteño criminal street gang. He testified that as of January 10, 2015, the Norteños were an ongoing organization, association, or group of three or more, numbering over 3,000 individuals in Monterey County. He testified that Barnett was a Crips gang member with a Crips gang tattoo. According to Gibson, asking someone where they are from was common before a gang shooting. Based on a hypothetical that mirrored the facts of the case, Gibson opined that the crime would have been committed for the purpose of benefitting the Norteño criminal street gang.

### 2. Defense Case

Police spoke to the driver of the vehicle that Barnett was standing near when he was shot. The driver stated he had an altercation with Barnett. After speaking with the driver, however, police eliminated him as a suspect in the killing.

The owner of the barbershop testified that he had known Barnett since he was 12 or 13 years old. Barnett was a friend and the owner was familiar with his children. Barnett came to the shop that day with his sons to get haircuts. Barnett arrived sober but

---

[2] This evidence will be discussed in greater detail in connection with the ineffective assistance claims.

4

later on seemed like he had consumed some alcohol. Barnett left at some point. When he came back, he was "a little" upset and said, "they be tripping out here more." At some point while Barnett was at the barbershop, Barnett "squared off" with another man who often hangs out there. It started when Barnett tried to give the man a hug, which Barnett would often do when he was drinking. The other man "shoved him off of him." The owner reminded them that there was no fighting inside or outside the shop. The owner did not really think they were going to fight because Barnett and the other man had a lot of respect for one another. The owner stated: "It was kind of laughable. We was all laughing, including me."

When the owner closed the barbershop at around 10:00 p.m., Barnett stood outside in the parking lot. "Something got [Barnett's] attention," meaning someone talked to him or yelled at him. The owner allowed that he might have heard someone yell "DD," which was a nickname Barnett went by. The owner saw Barnett hit the ground and then he "ducked back into the shop."

### B.     No Contest Plea:  Case No. 17CR006465

According to the probation report, on December 17, 2017, deputies heard loud slamming, shuffling, and shouting in the jail's D-Pod housing unit. The D-Pod housing unit was used to house "sophisticated Norteno gang members with violent charges." Deputies observed John Doe being led shirtless down a flight of stairs by two other inmates, one of whom was punching Doe. Doe appeared to have multiple lacerations on his face and blood stains on his torso. The deputies called for backup and waited. Inmates saw the deputies waiting for assistance and moved down the stairs, where they continued to punch Doe in the head and face. After more deputies arrived, the deputies entered D-Pod and saw defendant and other inmates assaulting Doe. Deputies used a Taser on defendant and another inmate, and the assault ended.

Doe was interviewed and recalled that he was getting ready to use the restroom when a number of inmates entered his room and began to strike him with their fists. He

5

did not recall who struck him. Doe's medical records show he suffered from left periorbital edema and a superficial linear abrasion, as well as multiple body contusions.

Defendant was interviewed after the assault and stated, " 'It is what it is.' " Video surveillance showed that defendant and other inmates were the aggressors, and that defendant repeatedly hit Doe with his fists on Doe's back and torso. In a later interview, defendant admitted the assault, saying "he was fed up with the victim, and while incarcerated, inmates are grown men in cages."

Defendant entered a plea of no contest to a single count of assault by means of force likely to produce great bodily injury and admitted that he committed the act in association with a criminal street gang. As part of the plea agreement, he agreed to a stipulated sentence of four years, consecutive to any other sentence.

## II. DISCUSSION

### A. Failure to Object to Hearsay Testimony

Defendant argues that his trial counsel was prejudicially deficient when he failed to object to testimony that official records indicated that the gang member who testified against appellant was a high-ranking Norteño.

#### 1. Background

George Campbell testified that he was a Norteño gang member, a member of the Soledad Vatos Locos subset, and had attained the rank of "Norteño Soldado" in 2011. A Norteño Soldado is a member of the Northern Structure, a subset of the Nuestra Familia. He had been a member of the gang since he was 16 years old. He described the hierarchy of the Norteño gang, the expectations and behaviors of its members, and how the gang operates in the prison system. He recited the oath he took when he became a Norteño Soldado. Campbell was currently in custody for attempted murder because he had shot a "dropout" gang member.

Campbell described entering the Monterey County prison system and the screening process he underwent. Upon being cleared, a senior Norteño asked to speak

6

with him. He was informed that he was being placed in charge of "D Pod," because the current leadership there "were not doing what they were supposed to do." Campbell's appointment replaced defendant, who was demoted to being a "secretary" under Campbell. Defendant was "insubordinate" and "disrespectful" to Campbell. Campbell tried to work with defendant but eventually filed papers to have defendant stripped of his leadership role. Defendant became embittered, causing Campbell to place a "freeze" on him, meaning he always had "two security blankets" or "hit men" armed with knives who followed defendant around.

At some point, Campbell was placed on a freeze, after the gang leadership was informed that he had been associating with dropouts. Campbell denied the accusations. He later learned that defendant was one of the people who made the accusation. Campbell felt upset, betrayed, and heartbroken because he had dedicated his life to the Norteño street gang. He blamed defendant in large part for his predicament. After some time passed, Campbell decided to renounce his Norteño Soldado oath and indicated to prison officials he was willing to provide information.

At trial, Campbell testified that he spoke with defendant, asking him, "[w]hat are you here for?" Defendant responded, "I'm here for killing a [black man]."[3] Campbell gave defendant "a strong-arm gesture," which was "like a high-five basically with the Norteño struggle." In another conversation, defendant expressed concern to Campbell about someone "snitching on me." Defendant again offered that he "killed a [black man]."

Drew Bittner, a correctional officer and institutional gang investigator with California's Department of Corrections and Rehabilitation (CDCR), testified about the Nuestra Familia and Northern Structure. As part of his work, he identified "current prison gang members, street gang[] members; criminal activity occurring inside the

---

[3] Campbell testified that defendant used a racial slur.

institution as well as outside [in] the communities; investigate gang homicides, batteries; document intel reports, vital information within discovered kites." He testified that he had reviewed Campbell's official records with CDCR. He stated that the official records indicated "Campbell was a validated Northern Structure associate." He also stated that Campbell's position meant "[h]e'll hold rank over any Norteño entering CDC's custody."

During closing arguments, defense counsel argued that "Campbell decided to take advantage of his position and save himself from life in prison" by testifying. He contended that Campbell was "a terrible witness in one sense and a great witness in another." Defense counsel explained that Campbell was "a good witness for the prosecution because he tells a story about his involvement in gangs, although it has nothing to do with [defendant]." Defense counsel argued that the jury should not believe Campbell because he was biased: "Campbell . . . admitted that one of the reasons he's upset was because Mr. Ramirez, according to him, this person with such magnitude in the gang, to be put on freeze. For him, a humiliation. The gang is and probably still is his main object in life. It's his identity. He is intricately involved with the gang." Then defendant became "insubordinate, didn't follow rules, he and his friends weren't listening to him, and this caused him no amount of anguish. And then he ends up getting put on freeze." This, counsel concluded, showed that Campbell's testimony was influenced by bias and prejudice, and so should be discounted by the jury.

### 2. *Discussion*

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 391.) As to counsel's representation, "[a] reviewing court will indulge in a presumption that counsel's

8

performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*Ibid.*)

"Failure to object rarely constitutes constitutionally ineffective legal representation . . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Thus, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

Here, the record does not reflect why defense counsel did not object to Bittner's testimony regarding Campbell's gang status. However, it is apparent that counsel had sound tactical reasons for not objecting to the testimony. In closing argument, defense counsel explicitly argued that Campbell's testimony should be rejected because Campbell was biased and prejudiced against defendant. Defense counsel noted that Campbell had been placed on a freeze, which for someone with his position and longtime affiliation with the Norteños, must have "caused him no amount of anguish." Put another way, defense counsel's bias argument explicitly relied on the fact that Campbell and defendant had a shared gang status, and that Campbell's status within the gang was one of authority. Campbell's gang status was a necessary component of defendant's defense. Thus, on this record, because the record reflects a sound tactical basis for allowing Bittner's testimony regarding Campbell's gang status to be admitted, this ineffective assistance claim must be rejected.

### B.    *Failure to Object to Prosecution's Closing Argument*

Defendant argues that his trial counsel was prejudicially deficient in failing to object to an argument made by the prosecution during closing argument.

9

### 1. Background

In closing argument, the prosecution addressed the surveillance video showing defendant near the scene of Barnett's murder just before it occurred: "[Defendant] repeatedly says that that's him in the video, but he repeatedly denies doing the shooting. We expect that. People don't want to admit that they killed somebody because they know there's consequences to that. [¶] But never does [defendant] tell you where he was going at 10:00 when he was supposed to be at work. Never does he say what he was doing at Chin Market and heading toward [the barbershop] when he was supposed to be at work. And never says why he was there. He just says, yeah, that's me, I didn't do it. He never says what he was doing, why he was there, where he was going. Anything that you would logically expect from somebody. [¶] You would expect, I didn't do it, I was going to meet a friend. I didn't do it, I was walking down town. I didn't do it, I was going to go to a restaurant. I didn't do it, I was lost. Whatever. There is no explanation whatsoever. 'I didn't do it' is not sufficient. [¶] It's just another piece of the puzzle. Shows the inconsistencies, it shows the lies, it shows the consciousness of guilt. There's a jury instruction that says if you find that he lies -- I don't want to misstate it, but there is a jury instruction that goes to consciousness of guilt when a person lies, consider that. So he lies about being at work."

After closing arguments and out of the jury's presence, defense counsel addressed the trial court: "One thing judge. Well, two things. [¶] One's a nice thing. One's a not so nice thing. [¶] The nice thing is I'm loath to interrupt argument as the Court's aware. The People at one point in time -- I just wanted it noted for the record and I'm not asking for anything at this point in time, I just want to make sure that the record reflects I'm aware of this. [¶] At one point in time during the closing, the People said the People can call any number of witnesses, something to that effect, but how about the Defense, did anybody say the defendant didn't do it? [¶] I didn't want to interrupt the argument. I thought it would bring more attention to it. I want the strategy to be clear that it would

bring more attention to it.  I think that statement shifts the burden of proof.  I want the record to reflect I did note it, and I'm not asking for anything at this point."  The court responded, "Your objection is noted."

### 2. Analysis

The parties both assert that defense counsel stated on the record his reasons for not objecting to the statements now challenged on appeal.  However, a close reading of defense counsel's explanation demonstrates that defense counsel was not referring to the statements now challenged on appeal but was actually referring to *another* argument made by the prosecution.  During the closing argument rebuttal, the prosecution addressed defense counsel's suggestion that the prosecution had failed to call certain witnesses who might have critical information.  The prosecution explained that one of the witnesses "never gave any information.  Why would I call a person that has no information?  That was news to me."  The prosecution continued:  "So the People should call all logical witnesses?  What about the Defense?  Anybody say the defendant didn't do it?"  Later, defense counsel, in identifying the statement he found objectionable, stated:  "At one point in time during the closing, the People said the People can call any number of witnesses, something to that effect, but how about the Defense, did anybody say the defendant didn't do it?"  Clearly, defense counsel's stated reasons for not objecting related to the prosecution's statement that defendant had failed to call any witness that said "defendant didn't do it[.]"  On appeal, defendant does *not* challenge this statement by the prosecution.  Accordingly, as to the challenged argument that defendant failed to explain his presence near the crime scene, the record is silent as to the reasons why defense counsel declined to object.

On the silent record that we have here, we will not assume defense counsel's failure to object to the prosecution's argument rendered his assistance ineffective.  As our high court has "repeatedly stressed," if " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked

11

for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal *must be rejected.*' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266, italics added.) "[T]actical choices presented . . . on a silent record . . . are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them." (*People v. Mayfield* (1993) 5 Cal.4th 142, 188.) This is not a case where there could be no satisfactory answer. Indeed, defense counsel could have reasonably concluded that an objection to the prosecution's argument would draw undue attention to it. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [finding no ineffective assistance of counsel where counsel's failure to object could be explained as a tactical decision not to draw the jurors' attention to comments by the prosecutor]; *People v. Milner* (1988) 45 Cal.3d 227, 245 [finding no ineffective assistance of counsel where counsel failed to object to the prosecutor's statements during argument because counsel could reasonably have chosen to ignore the statements rather than draw attention to them by objecting], disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) Accordingly, we must reject the ineffective assistance claim.

What is more, defendant has not demonstrated that counsel's performance was deficient, as the prosecution's argument was permissible in the context of the closing argument. A prosecutor is given wide latitude in arguing a case to the jury as long as it amounts to fair comment on the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) It is not improper for a prosecutor to comment on "the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Carter* (2005) 36 Cal.4th 1215, 1266.)

Contrary to defendant's assertion, the prosecution's comments did not suggest to the jury that the defense bore any burden of proof or that defendant had a duty to establish any fact. Rather, the remarks consisted of nothing more than fair comment on the state of the evidence. The prosecution's argument suggested to the jury some reasonable inferences that could be deduced from the surveillance video showing

12

defendant near the scene of Barnett's murder and defendant's initial explanation that he was at work at the time. Defendant eventually acknowledged his presence at the scene when faced with the evidence that he was there. The prosecution reasonably argued that this evidence was an additional "piece of the puzzle" as it showed that defendant initially lied about his whereabouts, but when confronted with the surveillance video offered no further explanation for his presence at the crime scene. Because the argument was a permissible comment on the state of the evidence, defense counsel was not deficient for failing to object to it.

Finally, even assuming trial counsel's performance was deficient, defendant's challenge nonetheless fails because he has not established any prejudice resulting from that assumed error. "When attacking the prosecutor's remarks to the jury, [a] defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

Here, the trial court instructed the jury that defendant "is presumed to be innocent" and that "[t]his presumption requires that the People prove a defendant guilty beyond a reasonable doubt." The court also told the jury that defendant had "an absolute constitutional right not to testify," and that he "may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." The court also told the jury to "[e]valuate the witness's testimony according to the instructions I have given you." We presume jurors are intelligent and capable of understanding and correlating all jury instructions given. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

13

Thus, we presume the jury followed the instructions notwithstanding the prosecution's arguments. (*People v. Osband* (1996) 13 Cal.4th 622, 717 [reviewing court presumes " 'that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' "].) Accordingly, even assuming deficient performance, defendant was not prejudiced by the failure to object to the prosecution's argument.

### C. Cumulative Error

Defendant argues that the cumulative prejudicial effect of trial counsel's errors deprived him of a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

In this case, we have rejected defendant's claims of ineffective assistance. In one part of the analysis we assumed error but found it harmless. Insofar as there were no other errors to cumulate with the assumed error, we must reject defendant's cumulative error argument.

### D. Assembly Bill No. 333

Defendant argues that amended section 186.22 applies retroactively and that under the amended statute there is insufficient evidence to support imposition of the gang enhancements in both cases. Defendant also contends that the jury instructions for the section 186.22 gang enhancement were deficient. The Attorney General agrees that remand is required with regard to the gang enhancements. Defendant also contends that newly enacted section 1109 applies retroactively and requires a retrial of the murder count. The Attorney General disagrees.

#### 1. Section 186.22

"Assembly Bill No. 333 . . . amended section 186.22 by modifying the definitions of 'pattern of criminal activity' and 'criminal street gang,' and it clarified what is

14

required to show an offense 'benefit[s], promote[s], further[s], or assist[s]' a criminal street gang." (*People v. Perez* (May 2, 2022, B300396) __ Cal.App.5th __ [2022 WL 1302282 at p. 16] (*Perez*).)

"[P]ursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. [Citation.] With respect to common benefit, the new legislation explains: '[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' [Citation.]" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

We agree with the parties regarding the retroactive application of amended section 186.22. The amendments to section 186.22 by Assembly Bill No. 333 increased the threshold for conviction under the gang enhancement statute. " '[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to [a] pending case.' [Citation.]" (*Lopez*, *supra*, 73 Cal.App.5th at p. 344.) Accordingly, defendant is entitled to retroactive application of amended section 186.22. (*Ibid.* [finding amended section 186.22 to be retroactive]; *Perez*, *supra*, __ Cal.App.5th __, __ [2022 WL 1302282 at pp. 16–17] [finding amended section 186.22 to be retroactive].)

15

The parties agree that the record lacks substantial evidence that the predicate offenses "provide[d] a common benefit to members of a gang where the common benefit is more than reputational," as required by amended section 186.22. Indeed, the record is very thin on the nature, purpose, or details of the five predicate offenses, which were proved by admitting into evidence records of conviction for other claimed Norteño gang members. Thus, the record is insufficient to support the heightened proof requirements of amended section 186.22. Accordingly, we vacate the gang enhancements and remand the matter to allow the prosecution the opportunity to retry the enhancement allegations.[4] (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.) Because we vacate the gang enhancements, we do not address defendant's argument that the jury instructions for the gang enhancement were erroneous.

### 2.     Section 1109

Defendant argues that section 1109 applies retroactively to his case, and under that section, he was entitled to a bifurcated trial on the gang enhancement that was tried to a jury. He argues that the error in not receiving a bifurcated trial on the gang enhancement allegation warrants reversal of his murder conviction. The Attorney General contends that defendant forfeited this contention by not requesting bifurcation below, that section 1109 operates prospectively only, and that even if bifurcation was required, any error was harmless.

In addition to amending section 186.22, Assembly Bill No. 333 also enacted section 1109. Section 1109, which took effect on January 1, 2022, requires trial courts to bifurcate the trial on a gang enhancement if the defendant so requests. (§ 1109, subd. (a);

---

[4] The Attorney General contends that on remand, with respect to the gang enhancement that defendant admitted as part of his plea, the prosecution should be permitted to withdraw from the plea agreement. On remand, the trial court may consider this argument and determine, in the first instance, whether it is appropriate to allow the prosecution to withdraw from the plea agreement.

16

Stats. 2021, ch. 699, § 5.)  A bifurcated trial on a gang enhancement will occur only if the defendant is first found guilty of the underlying offense.  (§ 1109, subd. (a)(1) & (a)(2).)

Assembly Bill No. 333 did not expressly address whether any of its provisions were intended to apply retroactively or only prospectively.  "Generally, statutes are presumed to apply only prospectively.  [Citation.]  However, this presumption is a canon of statutory interpretation rather than a constitutional mandate.  [Citation.]  Accordingly, 'the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication.'  [Citation.]  Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively.  [Citation.]  [¶]  In *Estrada* . . . , [the California Supreme Court] held that amendatory statutes that *lessen the punishment for criminal conduct* are ordinarily intended to apply retroactively."  (*People v. Frahs* (2020) 9 Cal.5th 618, 627, italics added.)  " 'This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology.' "  (*Id.* at p. 628.)

We conclude that the *Estrada* presumption does not apply to section 1109 because section 1109 "is not an *ameliorative* statute within the meaning of the *Estrada* rule."  (*People v. Burgos* (2022) 550 Cal.App.5th 569 (dis. opn. of Elia, J.).)  We adopt the analysis in Justice Elia's dissent in *Burgos*.  Notably, section 1109 "does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or defense."  (*Burgos*, at p. 572 (dis. opn. of Elia, J.).)  Rather, "[s]ection 1109 . . . is a prophylactic rule of criminal procedure expressly intended to employ new procedures aimed at enhancing the fairness of future criminal proceedings.  It makes no change to any crime or defense and makes no change to any punishment provision, and it does not create the possibility of lesser punishment or any other 'ameliorative' benefit from which it could be inferred that failing to extend that benefit retroactively must have been motivated by a 'desire for vengeance.' "  (*Ibid.*; accord *Perez*, *supra*, __

17

Cal.App.5th __, __ [2022 WL 1302282 at p. 17] ["[S]ection 1109 is a procedural statute that ensures a jury will not be prejudiced by the introduction of evidence to support gang enhancement allegations—it does not reduce the punishment imposed."].) Thus, section 1109 operates prospectively only, and defendant is not entitled to retroactive application of the bifurcation statute.[5]

## III.    DISPOSITION

The judgments are reversed, and the true finding and admission on the gang allegations under section 186.22 are vacated. The matter is remanded with directions to permit the prosecution the opportunity to elect whether to retry the gang allegation that was tried to a jury. As to the gang allegation that was previously admitted by defendant pursuant to a plea agreement, the prosecution may, on remand, request that the trial court permit the prosecution to withdraw from the plea agreement.

---

[5] Because we find section 1109 does not apply retroactively, we need not address the Attorney General's argument that defendant forfeited the claim. For this same reason, we also need not address the argument that, assuming section 1109 applied retroactively, the failure to receive a bifurcated trial on the gang enhancement was harmless.

_____
ELIA, ACTING P.J.

I CONCUR:


_____
BAMATTRE-MANOUKIAN, J.




*People v. Ramirez*
H047847

BAMATTRE-MANOUKIAN, J., Concurring.

For the reasons stated in the majority opinion here and in the dissent in *People v. Burgos* (2022) 77 Cal.App.5th 550, 569 (dis. opn. of Elia, J.) (*Burgos*), I concur that newly enacted Penal Code section 1109[1] does not apply retroactively. I write separately to briefly elaborate on why I conclude that section 1109 is not ameliorative.

*In re Estrada* (1965) 63 Cal.2d 740, 742 (*Estrada*), the California Supreme Court held that a statutory amendment lessening punishment is presumptively retroactive and applies to judgments not yet final when the amendment takes effect. " 'The *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308 (*Lara*).)

In the *Estrada* context, an ameliorative law is one that mitigates the legal effect, or consequences, of criminal conduct. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 (*Tapia*).) For example, courts have found a law to be ameliorative when it eliminates or reduces a defendant's criminal liability by decriminalizing conduct (*People v. Rossi* (1976) 18 Cal.3d 295, 298), adding new elements to an offense (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344), or providing a new defense (*People v. Wright* (2006) 40 Cal.4th 81, 94-95). A law is also ameliorative when it lessens the punishment (*Estrada*, *supra*, 63 Cal.2d at p. 745) or possible punishment (*People v. Francis* (1969) 71 Cal.2d 66, 76) for the conduct itself or reduces the possible punishment for a class of persons who committed the conduct (*Lara*, *supra*, 4 Cal.5th at p. 308; *People v. Frahs* (2020) 9 Cal.5th 618, 624 (*Frahs*)). In providing for the bifurcation at trial of gang charges and enhancements, section 1109 does none of those things—it effects no

---

[1] All further statutory references are to the Penal Code.

reduction to the legal consequences of a defendant's criminal conduct either through a change to the definition of a crime or a lessening of punishment.

In *Lara* and *Frahs*, the California Supreme Court determined that the legislation at issue was ameliorative because it mitigated the possible punishment for a class of persons who committed criminal conduct. (*Lara*, *supra*, 4 Cal.5th at p. 306 [observing regarding legislation that prohibits prosecutors from charging juveniles directly in adult court that "[w]hile a person convicted of serious crimes in adult court can be punished by a long prison sentence, juveniles are generally treated quite differently, with rehabilitation as the goal"]; *Frahs*, *supra*, 9 Cal.5th at p. 624 [holding that laws creating the possibility of mental health diversion applied retroactively to a defendant who stole beverages from a store and threw rocks at cars].) In contrast, section 1109 involves a procedural change that may (or may not) alter when gang evidence is admitted at trial as gang evidence relevant to the underlying charges would still be admissible.[2] If the *Estrada* rule is to be broadly extended to include any procedural change that may possibly benefit a criminal defendant, I would respectfully seek that direction from the California Supreme Court.

For the reasons expressed in the majority opinion here and in the *Burgos* dissent, and because section 1109 does not mitigate the legal consequences of criminal conduct, I concur that section 1109 is not ameliorative and does not apply retroactively.

---

[2] In *Tapia*, when deciding whether provisions enacted through Proposition 115 should be applied to prosecutions of crimes committed before the initiative's effective date, the California Supreme Court noted "the general rule that statutes addressing the conduct of trials are prospective." (*Tapia*, *supra*, 53 Cal.3d at pp. 290-291.)

BAMATTRE-MANOUKIAN, J.

_People v. Ramirez_
**H047847**

WILSON, J., Concurring.

I concur in the result.  I write separately because, unlike the majority, I conclude that Penal Code section 1109[1] is ameliorative within the meaning of the *Estrada* rule and therefore retroactive as well.  (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).)  As applied here, though, I believe the failure to bifurcate the trial was harmless; accordingly, I concur with the majority's disposition.

### A.  Section 1109 is an ameliorative statute

In my view, section 1109 provides defendants charged with gang enhancements the ameliorative benefits of a bifurcated trial that reduces the risk of prejudice, thereby increasing the possibility of acquittal and making a lesser punishment possible.  It is therefore intended to apply retroactively.  (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*); *Estrada*, *supra*, 63 Cal.2d at pp. 744-745.)

As the California Supreme Court has explained, " '[t]he *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' "  (*Frahs*, *supra*, 9 Cal.5th at p. 628, quoting *People v. Conley* (2016) 63 Cal.4th 646, 657.)

In *People v. Burgos*, a different panel of this court recently held that section 1109 is an ameliorative statute because bifurcation increases the possibility of acquittal, "which necessarily reduces possible punishment."  (*People v. Burgos* (2022) 77 Cal.App.5th 550, 567 (*Burgos*).)  The majority cited legislative findings for Assembly Bill No. 333 (2021-2022 Reg. Sess.) showing that section 1109 was intended to reduce punishment: " 'Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact.' "  (*Burgos*, *supra*, at p. 566, quoting Assem. Bill No. 333, § 2,

---

[1] Unspecified statutory references are to the Penal Code.

subd. (f).)  The findings also noted that bifurcation is intended to mitigate the possibility of wrongful convictions and pressure on defendants to accept unfavorable plea deals " 'rather than risk a trial filled with prejudicial evidence and a substantially longer sentence.' "  (*Burgos*, *supra*, at p. 567.)

The majority in *Burgos* also relied on the California Supreme Court's recent decision in *Frahs*.  (*Burgos*, *supra*, 77 Cal.App.5th at p. 566.)  In that case, the court considered the retroactive application of newly enacted sections 1001.35 and 1001.36, which give trial courts the discretion to grant pretrial diversion for certain defendants with mental health disorders.  (*Frahs*, *supra*, 9 Cal.5th at pp. 624, 626.)  The court held that section 1001.36 "by design and function provides a possible ameliorating benefit for a class of persons—namely, certain defendants with mental disorders—by offering an opportunity for diversion and ultimately the dismissal of charges."  (*Frahs*, *supra*, at p. 624.)  In addition, "the procedures instituted by the enactment carry the potential of substantial reductions in punishment for the [defendants]."  (*Id*. at p. 631.)

Similarly, the majority in *Burgos* relied on *People v. Superior Court* (*Lara*), in which the California Supreme Court determined that the *Estrada* rule applied to Proposition 57, which prohibits prosecutors from directly filing charges against a minor in adult criminal court and gives juvenile courts the sole discretion to determine whether a minor can be prosecuted and sentenced as an adult.  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.)  The court held that, even though Proposition 57 did not mitigate punishment for any particular crime, *Estrada* nevertheless applied because it "reduces the possible punishment" for juveniles.  (*Id*. at p. 303.)  Specifically, "[t]he possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment."  (*Ibid*.; see *id*. at pp. 306-307.)  The court found "the potential ameliorating benefit of remaining in the juvenile court system" to be

2

analogous to "the potential reduction in a criminal defendant's sentence."  (*Frahs*, *supra*, 9 Cal.5th at p. 629.)

I agree with the majority in *Burgos* in the following respects.  As in *Frahs*, section 1109 "provides a *possible* ameliorating benefit for a class of persons"—here, by offering the opportunity for a bifurcated trial free from prejudicial gang enhancement evidence.  (*Frahs*, *supra*, 9 Cal.5th at p. 624, italics added.)  Additionally, the "procedures instituted by the enactment carry the *potential* of substantial reductions in punishment" (*id*. at p. 631, italics added) for the defendants—here, by mitigating the possibility of wrongful convictions and the risk of " 'substantially longer sentence[s].' " (*Burgos*, *supra*, 77 Cal.App.5th at p. 567; Assem. Bill No. 333, § 2, subd. (e).)

Similarly, as in *Lara*, I find "the potential ameliorating benefit" (*Frahs*, *supra*, 9 Cal.5th at p. 629) of bifurcated trials free from prejudicial gang enhancement evidence to be " 'analogous to the potential reduction in a criminal defendant's sentence.' " (*Lara*, *supra*, 4 Cal.5th at p. 309.)

In another recent case, the Fifth Appellate District reached a similar conclusion with respect to section 1109.  (*People v. Ramos* (2022) __ Cal.App.5th __ [2022 Cal.App. Lexis 355] (*Ramos*).)  The court held that "by its plain language, Assembly Bill [No.] 333 is an ameliorative change to the criminal law intended to benefit a class of criminal defendants by reducing the potential harmful and prejudicial impact of gang evidence through bifurcation." (*Id*. at p. __ [2022 Cal.App. Lexis 355 at p. *23].)  Further, the court held that "[t]he legislation is geared to address wrongful convictions and mitigate punishment resulting from the admission of irrelevant gang evidence at trial; accordingly, the logic of *Estrada* applies."  (*Ibid*.)

By contrast, the majority in this case holds that section 1109 is not an ameliorative statute because it "does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense."  (Maj. opn., *ante*, at p. 17.)  As explained above, I believe section 1109 does make a lesser punishment possible because it carries

3

"the potential of substantial reductions in punishment" (*Frahs*, *supra*, 9 Cal.5th at p. 624) by mitigating the possibility of wrongful convictions and the risk of "substantially longer sentence[s]." (Assem. Bill No. 333, § 2, subd. (e).)

The majority also views section 1109 as a "prophylactic rule of criminal procedure . . . aimed at enhancing the fairness of future criminal proceedings." (Maj. opn., *ante*, at p. 17.) Similarly, the *Burgos* dissent, which the majority here expressly adopts, stated that "there is a manifest distinction between the Legislature's creation of new criminal procedures designed to enhance fairness and its enactment of provisions that reduce the possibility of punishment." (*Burgos*, *supra*, 77 Cal.App.5th at p. 574 (dis. opn. of Elia, J.).) While there may be a distinction between those two concepts, I do not believe they are mutually exclusive. Moreover, I believe section 1109 is designed to achieve both: to enhance fairness *and* reduce the possibility of punishment. Consistent with that, the Legislature expressly found that section 1109 is intended to reduce the harmful and prejudicial impact of gang evidence, thereby potentially reducing wrongful convictions and minimizing the risk of longer sentences. (Assem. Bill No. 333, § 2, subd. (f).)

In short, I believe section 1109 is ameliorative because it carries "the potential of substantial reductions in punishment for the [defendants]" and provides the benefit of bifurcated trials free from prejudicial gang enhancement evidence. (*Frahs*, *supra*, 9 Cal.5th at p. 631; *Lara*, *supra*, 4 Cal.5th at pp. 308-309.) As the California Supreme Court has stated, " ' "absent a saving clause, a criminal defendant is entitled to the benefit of a change in the law during the pendency of his appeal." ' " (*People v. Wright* (2006) 40 Cal.4th 81, 95 (*Wright*), quoting *People v. Babylon* (1985) 39 Cal.3d 719, 722.)

### B. *The failure to bifurcate was harmless*

Although I believe section 1109 is ameliorative and applies retroactively, I would not require retrial of the underlying first degree murder conviction because the failure to bifurcate was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [evaluating

4

nonstructural state law error under harmlessness standard]; *Chapman v. California* (1967) 386 U.S. 18, 24 [error must be harmless beyond a reasonable doubt].).[2]

In *Burgos*, a different panel of this court, after determining that section 1109 is ameliorative and retroactive, considered the circumstances to constitute " 'structural error' " that necessitated reversal because they " 'def[ied] analysis by harmless-error standards.' " (*Burgos*, *supra*, 77 Cal.App.5th at p. 568, quoting *Arizona v. Fulminante* (1991) 499 U.S. 279, 280.) The court stated that "[t]he case law does not clearly establish whether or how harmless error analysis applies in this instance," because "[i]t is difficult to determine how the outcome of the trial would have been affected if it had been bifurcated [where] the nature of the proceeding would have been entirely different." (*Burgos*, *supra*, at p. 568.) Nevertheless, the court concluded that, regardless of the standard that applied, the defendants suffered prejudice. (*Ibid.*) In the court's view, given the nature of the evidence, it was likely the jury relied on evidence of the defendants' gang membership. (*Ibid.*)

By contrast, in *Ramos*, the Fifth District did not consider it to be structural error, but instead held that it could not conclude it was reasonably probable the defendant would have obtained a more favorable verdict in the absence of the gang evidence, had the matter been bifurcated. (*Ramos*, *supra*, __ Cal.App.5th at p. __ [2022 Cal.App. Lexis 355 at p. *27].)

I would not find structural error here. Rather, because the admission of prejudicial evidence typically constitutes trial error, a reviewing court can evaluate the extent of the prejudice. (See, e.g., *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [applying *Watson* harmless error analysis].)

---

[2] I would not decide whether the state or federal law standard for harmless error analysis applies here because, under either standard, reversal is not warranted. (See, e.g., *Wright*, *supra*, 40 Cal.4th at p. 98.)

5

Evaluating the evidence here, I conclude that the failure to bifurcate was harmless. First, the evidence of Ramirez's guilt on the underlying charges included what could be considered a confession of murder to Campbell; a surveillance video showing Ramirez, just before the shooting, approaching the area where the victim was murdered; Ramirez's subsequent admission that he was at the scene at the time of the murder; testimony by the victim's son regarding the initial incident between Ramirez and the victim; and testimony by another witness who observed Ramirez that evening near the scene just before the murder, in which she described him as intoxicated and cussing, and waving a gun in the air. In such circumstances, "it is unlikely the defendant was harmed by the format of the trial." (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480, citing *People v. Pinholster* (1992) 1 Cal.4th 865, 931, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459 [failure to bifurcate was harmless because of overwhelming evidence of defendant's guilt on relevant charges].)

Second, section 1109 does not necessarily preclude gang-related evidence in a bifurcated trial if the evidence relates to the underlying charges. (*Ramos*, *supra*, __ Cal.App.5th __ [2022 Cal.App. Lexis 355 at p. *27].) Here, as in *Ramos*, some of the gang-related evidence was relevant to Ramirez's actions prior to the murder, his motive for pursuing the victim, and his confession to Campbell. (*Ibid*.; see also *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary."].)[3]

Otherwise, I concur with the majority's disposition.

---

[3] Because I would find that the failure to bifurcate was harmless, I would not reach the People's argument that Ramirez forfeited his bifurcation claim.

_____
WILSON, J.

*People v. Ramirez*
H047847

Trial Court:                                  Monterey County Superior Court


Trial Judge:                                  Honorable Pamela L. Butler


Attorney for Defendant and Appellant:         Candace Hale
                                              By Appointment of the Court of
                                              Appeal, Under the Sixth District
                                              Appellate Program


Attorney for Plaintiff and Respondent:        Rob Bonta
                                              Attorney General of California

                                              Lance E. Winters
                                              Chief Assistant Attorney General

                                              Michael P. Farrell
                                              Senior Assistant Attorney General

                                              Eric L. Christoffersen
                                              Supervising Deputy Attorney General

                                              Ivan P. Marrs
                                              Deputy Attorney General

*People v. Ramirez*
H047847